### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **DANIEL JOHN RILEY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 1:10-cv-218-GZS** |
| | ) | |
| **JAMES ALLANDYDY, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED DECISION ON DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Michael Allen, Joseph Buchanan, Jeffrey Mertes, and Stephen Monier, the remaining named defendants in this case, seek summary judgment as to plaintiff Daniel John Riley's surviving claims against them, which are predicated on their alleged use, or complicity in the use, of excessive force to detain him during a United States Marshals Service ("USMS") operation to execute warrants for the arrest of Edward and Elaine Brown at the Browns' property in Plainfield, New Hampshire, on June 7, 2007. *See* Defendants' Motion for Summary Judgment ("Motion") (ECF No. 45) at 1; Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendants' Memo") (ECF No. 45-1), attached thereto, at 1-2.[1]   The

---

[1]  In addition to Allen, Buchanan, Mertes, and Monier, Riley sued Mark Alford, James Allandydy, and Phillip Christiana, as well as John Does ##1-8, bringing claims pursuant to *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), of (i) civil conspiracy, (ii) excessive force in violation of the Fourth Amendment, (iii) false arrest/imprisonment in violation of the Fourth Amendment, (iv) assault and battery in violation of state law, and (v) false arrest/imprisonment in violation of state law.  *See* Bivens Action ("Complaint") (ECF No. 1) ¶¶ 32-47.  Judge Singal granted in part a motion by the defendants to dismiss all claims against them, dismissing (i) Counts III, IV, and V, (ii) Count I to the extent that it alleged a conspiracy to arrest and detain Riley in violation of the Fourth Amendment, and (iii) all claims against Alford and Christiana.  *See* Order on Motion To Dismiss ("Dismiss Order") (ECF No. 25) at 11.  Remaining are Count I, to the extent that it alleges a civil conspiracy predicated on the use of excessive force, and Count II, which alleges the use of excessive force.  *See id.* at 8-10; Complaint ¶¶ 32-36.  Although the court did not expressly dismiss all claims against Allandydy, Riley did not allege that Allandydy used, or conspired to use, excessive force against him, *see* Complaint ¶¶ 12-21, and the parties agreed, in a joint discovery plan submitted subsequent to the issuance of the order on the motion to dismiss, that (*continued on next page*)

defendants also seek summary judgment in favor of "John Doe" defendants on the ground that Riley's claims against those unknown defendants are time-barred. *See* Motion at 1; Defendants' Memo at 2. For the reasons that follow, I conclude that the remaining named defendants are entitled to qualified immunity and that Riley's claims against the John Doe defendants are time-barred. Hence, I recommend that the court grant the Motion.

## I. Applicable Legal Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable

---

Allen, Buchanan, Mertes, and Monier were "the remaining federal defendants[.]" ECF No. 29 at 2. To the extent that any action is necessary with respect to Allandydy, I recommend that the court *sua sponte* dismiss Riley's claims against him.

evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 7.2(b)

Pursuant to this court's Local Rule 7.2(b), "[a] memorandum in support of a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried." Loc. R. 7.2(b)(1). "A memorandum in opposition to a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial." Loc. R. 7.2(b)(2). "All properly supported material facts set forth in the moving party's factual statement shall be deemed admitted unless properly opposed by the adverse party." *Id.*

"[T]he purpose of rules such as LR 7.2(b)(1) is to prevent parties from improperly shifting the burden of organizing the evidence presented in a given case to the district court." *Ouahman v. Barnes*, Civil No. 11-cv-075-SM, 2012 WL 3076887, at *2 (D.N.H. June 14, 2012) (rec. dec., *aff'd* July 30, 2012) (citations and internal punctuation omitted); *see also, e.g., Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 28 (1st Cir. 2011) (observing that the purpose of Puerto Rico's similar "anti-ferret" rule "is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute") (citation and internal quotation marks omitted).

## II.  Factual Background

The parties' statements of material facts, credited to the extent supported by appropriate record citations in accordance with Local Rule 7.2(b), with disputes regarding cognizable facts resolved in favor of Riley as nonmovant, reveal the following facts relevant to this decision.

The USMS first became involved with Edward and Elaine Brown in 2006, when the Internal Revenue Service ("IRS") requested the USMS's assistance in arresting the Browns on tax-related charges.  Declaration of Stephen Monier in Support of Federal Defendants' Motion for Summary Judgment ("Monier Decl.") (ECF No. 30-2) ¶ 4 & Attachs. 1-2 (ECF Nos. 30-3 & 30-4) thereto.  Based on information provided by the IRS and the USMS's own investigation, the USMS was concerned about the Browns' potential for using violence during an arrest. Monier Decl. ¶ 4.  The USMS had reason to believe that Edward Brown was a member of a militia group called the United States Constitution Rangers and that he frequently carried weapons in public.  *Id.*  The USMS also knew that the Browns lived on a 110-acre wooded property in Plainfield, New Hampshire, and believed that they stored weapons there.  *Id.* Because of the potential for violence, the USMS successfully executed a ruse to arrest the Browns on the tax charges.  *Id.*

The Browns were later tried on the tax charges in this court.  *Id.* ¶ 5.  Edward Brown left in the middle of the trial, and, on January 12, 2007, the court issued a warrant for his arrest.  *Id.* & Attach. 5 (ECF No. 30-7) thereto.  Elaine Brown also failed to appear on January 12, 2007, but returned the following day.  Monier Decl. ¶ 5.  She and her husband were convicted on all counts.  *Id.* ¶ 5 & Attach. 6 (ECF No. 30-8) thereto.  Elaine Brown's conditions of release on bail included a condition that she not return to her Plainfield property.  Monier Decl. ¶ 5.  On February 20, 2007, the USMS became aware that she had returned to that property, and the court

4

promptly issued a warrant for her arrest.  *Id*. & Attach. 7 (ECF No. 30-9) thereto.

After the Browns ensconced themselves on their estate following their convictions, the Brown case attracted media attention and was the subject of substantial internet traffic.  Monier Decl. ¶ 6.  The USMS monitored internet traffic and media coverage pertaining to the Browns.  *Id*.  During this period, the Browns made statements in the media and on the internet threatening to harm any law enforcement agents who attempted to bring them into custody.  *Id*.  Because of these threats, Monier, then the United States Marshal for the District of New Hampshire, decided to proceed cautiously in developing the plan for arresting the Browns, and requested assistance from the USMS Special Operations Group.  *Id*. ¶¶ 1, 6.

The Special Operations Group is a select group of deputy United States marshals who are specially trained and provide assistance in dangerous law enforcement situations within the USMS's mission.  *Id*. ¶ 7; Declaration of Joseph Buchanan in Support of Federal Defendants' Motion for Summary Judgment ("Buchanan Decl.") (ECF No. 30-11) ¶ 2; Declaration of Jeffrey Mertes in Support of Federal Defendants' Motion for Summary Judgment ("Mertes Decl.") (ECF No. 30-12) ¶ 2; Declaration of Michael Allen in Support of Federal Defendants' Motion for Summary Judgment ("Allen Decl.") (ECF No. 30-13) ¶ 2.  The Special Operations Group often conducts high-risk tactical entries into buildings for armed fugitives and performs rescue operations.  *Id*.

The Special Operations Group assumed the lead in developing the plan for arresting the Browns.  Monier Decl. ¶ 8.  To assist in the planning, Monier provided the group with information about the Browns, including their location, their reputation for being heavily armed, their threats to harm law enforcement agents who tried to apprehend them, and observations about the Browns' conduct gleaned from surveillance, including that Edward Brown regularly

traveled to the end of his driveway to retrieve his mail.  *Id.* ¶¶ 6, 8.

From May 18 to 26, 2007, the Special Operations Group trained in Louisiana to develop a plan for arresting the Browns.  Buchanan Decl. ¶ 3; Mertes Decl. ¶ 3; Allen Decl. ¶ 3.  Allen, Mertes, and Buchanan attended this training.  *Id.*  During the training, the members of the Special Operations Group developed, practiced, and tested an operational plan for the mission. *Id.*  The plan was to hide several deputy United States marshals on the Brown property, arrest Edward Brown while he was retrieving his mail, and then negotiate for Elaine Brown's surrender.  Monier Decl. ¶ 8.  In addition to setting forth the arrest plan, the finalized Operations Order contained the following "Caution Statement":

> The BROWNs have a large network of supporters who maintain communication with the BROWNs via web pages and blogs.  These supporters have assembled in an effort to assist the BROWNs during the previous arrest (approximately 6 arrived at BROWN's dental office).  Sympathizers have been known to visit their residence at various times.  The current number of visitors to the residence var[ies] from 1-2 during the week and up to 30 on the weekends.  These sympathizers come from all over the country.  The local community is known to have sympathizers.

> The BROWNs have made requests via their internet postings for specific equipment, to include night vision equipment, weapons and body armor.  Their recent postings do not request such items, but have requested thermal imaging equipment, chlorine and ammonia.  The speculation is that the BROWNs may have received night vision equipment, body armor and weapons.  The BROWNs have indicated that they will die for their cause and postings on the web sites indicate their supporters share their beliefs.

> Additionally, the BROWNs should be considered armed and dangerous based on both the totality of the circumstances and the fact that Elaine BROWN has stated to news sources that "the only way we're coming out of our home is either as free man and free woman or in body bags."

Attach. 8 (ECF No. 30-10) to Monier Decl., at 3.

Buchanan, Mertes, and Allen all reviewed the final Operations Order in advance of executing the arrest plan for the Browns.  Buchanan Decl. ¶ 4; Mertes Decl. ¶ 4; Allen Decl. ¶ 4.

Therefore, each of them knew that the Browns had supporters who could be present on the property, that the Browns had threatened to harm any law enforcement officer who tried to arrest them, and that the Browns were likely armed.  Buchanan Decl. ¶ 5; Mertes Decl. ¶ 5; Allen Decl. ¶ 5.

On June 7, 2007, Special Operations Group members deployed to execute the arrest plan. Buchanan Decl. ¶ 6; Mertes Decl. ¶ 6; Allen Decl. ¶ 6.  That morning, the USMS inserted 50 members of the paramilitary-style Special Operations Group onto the Browns' property. Declaration of Daniel John Riley ("Riley Decl.") (ECF No. 47-1), Exh. 1 to Memorandum in Support of Plaintiff's Objection to Defendants' Motion for Summary Judgment ("Plaintiff's Memo") (ECF No. 47), ¶ 11; Excerpts from Transcript of Jury Trial, *United States v. Riley,* No. 07-CR-189-01, 02, 03-GZS (D.N.H.) ("Transcript Excerpts") (ECF No. 47-2), Attach. EE to Riley Decl., Day Eight – AM Session, at 88.

Mertes and Allen were part of an eight-man arrest team deployed in the woods near the mailbox at the entrance to the driveway of the Brown property and were armed with Sage multi-projectile launchers that fired less-than-lethal plastic rounds.  Mertes Decl. ¶¶ 6-7; Allen Decl. ¶¶ 6-7.  Allen also had a gun that fired lethal rounds strapped to his leg.  Allen Decl. ¶ 7.  Other members of the eight-man arrest team included a deputy armed with a Taser, another deputy armed with a shotgun that fired bean-bag rounds, and a third deputy armed with a rifle that shot lethal rounds.  Mertes Decl. ¶ 7.  All members of the arrest team carried sidearms in case lethal force proved necessary.  *Id*.; Allen Decl. ¶ 7.  The arrest plan, however, called for the use of non-lethal force to the extent possible.  *Id*.

In addition to the arrest team, there was a six-member blocking team deployed further down the driveway toward the Brown house.  Buchanan Decl. ¶ 6.  If the arrest team failed to

apprehend Edward Brown at the entrance to the driveway as he fetched the mail, the blocking team was supposed to obstruct his escape back to the house and take him into custody. *Id*. Buchanan was part of the blocking team and was armed with a rifle and a pistol that contained lethal rounds, and a Taser, a less-than-lethal weapon. Buchanan Decl. ¶¶ 6-7. There was also a sniper unit located near the Browns' house. Allen Decl. ¶ 9.

Monier was the marshal in charge during operations at the Browns' property on June 7, 2007. Riley Decl. ¶ 17; Transcript Excerpts, Day 9, Morning Session, at 64. He was not present at the scene. Monier Decl. ¶ 9. He was part of the management team stationed at a command post in Lebanon, New Hampshire, where he was watching the events in the entrance to the driveway by way of a video feed provided by a video camera posted in the woods. *Id*. The command post had radio communication with the teams on the Browns' property. Riley Decl. ¶ 16; Transcript Excerpts, Day 8, Afternoon Session, at 16.[2]

Once an encounter commenced with an individual in the driveway, Monier had no authority to give orders or directions from the command post to law enforcement personnel engaged at the Brown property. Monier Decl. ¶ 9. That authority belonged to the Tactical Operations Commander on site. *Id*. Monier had no information that any of the deputy marshals at the Brown property was likely to use excessive force. *Id*. ¶ 10.

On the morning of June 7, 2007, Riley took a walk with nothing but a cup of coffee in his hands and the Browns' dog as a companion. Riley Decl. ¶ 1. A sniper unit located near the Brown house provided information to the arrest team that someone was walking down the driveway with a dog. Mertes Decl. ¶ 8. None of the marshals knew who Riley was. Riley Decl.

---

[2] Monier states that he had no ability to communicate directly with law enforcement personnel on the site at the Brown property. Monier Decl. ¶ 9. However, I construe Riley's evidence to controvert that assertion. For purposes of the motion, I credit Riley's version of events.

¶¶ 10, 16; Transcript Excerpts, Day Eight, AM Session, at 90.

Riley walked within six to 10 feet of Mertes, who was hidden near the mailbox.  Mertes Decl. ¶ 8.  Upon stumbling upon the Special Operations Group arrest team, Riley believed that he had encountered some turkey hunters.  Riley Decl. ¶ 2.  Mertes and Allen stood up, Mertes Decl. ¶ 8; Allen Decl. ¶ 8, and one of them pointed a weapon at Riley's chest and said, "Freeze," Riley Decl. ¶ 3.  Mertes and Allen did not identify themselves.  *Id.*[3]  Riley turned and began running down the driveway toward the house, yelling, "Ed, they're here.  Ed, they're here." Video statement of Riley available at http://www.youtube.com/watch?v=abFglO1ZIKs; *see also* Mertes Decl. ¶¶ 8-9; Allen Decl. ¶ 8.[4]

Mertes and Allen considered it vital to the safety of the deputy marshals on the scene, particularly the sniper unit located nearest to the Brown residence, to stop Riley from warning Edward Brown that there were law enforcement officers on the property.  Mertes Decl. ¶ 9; Allen Decl. ¶ 9.  Mertes and Allen each fired one less-than-lethal round at Riley's legs, but missed.

---

[3] Mertes and Allen aver that they did identify themselves.  Mertes Decl. ¶ 8; Allen Decl. ¶ 8.  However, for purposes of the motion, I credit Riley's version of events.

[4] In his declaration submitted in opposition to the defendants' motion for summary judgment, Riley states that he turned and ran because he believed that he had just upset some turkey hunters and feared for his life at the hands of the "unknown assailants."  Riley Decl. ¶¶ 3-5.  Nonetheless, as the defendants point out, *see* Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Reply") (ECF No. 49) at 4, in a videotaped interview posted to the YouTube website, Riley himself stated that, as he turned and ran, he loudly shouted, "Ed, they're here.  Ed, they're here."  This version of the facts is consistent with Mertes' and Allen's statements that Riley began screaming to alert the residents of the house to the officers' presence.  Mertes Decl. ¶¶ 8-9; Allen Decl. ¶ 8.  In these circumstances, Riley does not succeed in raising a *genuine* issue of material fact as to whether he attempted to alert the Browns to the presence of suspected law enforcement officers as he turned and fled from Allen and Mertes.  *See Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir. 2001) ("'[G]enuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.") (citation and internal quotation marks omitted); *see also, e.g., Mlodzinski v. Lewis*, 648 F.3d 24, 28 (1st Cir. 2011) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (citation and internal quotation marks omitted); *De-Jesus-Adorno v. Browning Ferris Indus. of P.R., Inc.*, 160 F.3d 839, 841-42 (1st Cir. 1998) ("A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.") (citations and internal quotation marks omitted).

*Id.*[5]  In response to this use of force, Riley began yelling that he was unarmed, and "don't shoot" and "don't kill me."  Riley Decl. ¶ 5.

Shortly thereafter, Buchanan received a signal that Riley was heading back down the driveway toward the house and that the blocking team should intercept him.  Buchanan Decl. ¶ 8. Buchanan stepped in front of Riley with his rifle drawn and commanded him to stop, which Riley did after being told to do so several times.  *Id*.  Riley was surrounded by 12 intimidating-looking, camouflage-clothed, heavily armed men pointing rifles at him.  Riley Decl. ¶ 5.  Various verbal commands were being yelled at him, including, "Hands up, get on the ground, keep your hands where I can see them!"  *Id*. ¶ 6.  Riley was confused and so offered himself up to be handcuffed by putting his wrists together with open hands and extending his arms out.  *Id*. Without any warning, Buchanan then shot him with a 50,000-volt Taser, causing him excruciating pain and paralysis, followed by an abrupt, violent, uncontrolled fall.  *Id*.

---

[5]  Riley attempts to dispute that Mertes and Allen fired less-than-lethal rounds, stating that two shots of deadly gunfire just missed him.  Riley Decl. ¶ 4.  He avers that (i) he heard the distinctive "BANG!" of a rifle shot rather than the distinctive "thump" of a 37mm and did not see any 37mm (one and a half inch) diameter projectiles impact around him or pass him by, *id*., (ii) given his "familiarity with firearms," he could make out in a poor-quality copy of a videotape of the shooting that "the shooter used a rifle and not a launcher to shoot at [him], *id*. ¶ 14, and (iii) in the videotape, one can see a marshal pick up a shell casing from the shooting and hold it in his forefinger and thumb, *id*.  As the defendants argue, *see* Defendants' Reply at 2-3, Riley falls short of generating a genuine issue as to whether Mertes and Allen used lethal force.  Nowhere in his declaration does he explain how he developed a familiarity with firearms or the differences between rifles and projectile launchers, including any difference in the sound made by each or shell casings *versus* projectiles.  *See generally* Riley Decl.  His statements regarding those differences, thus, are not competent evidence that he was subjected to the use of lethal force.  *See, e.g., Sánchez-Rodríguez v. AT & T Mobility P.R., Inc.*, 673 F.3d 1, 9 (1st Cir. 2012) ("[T]he party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his claim.") (citations and internal quotation marks omitted); *Livick v. Gillette Co*., 524 F.3d 24, 28 (1st Cir. 2008) ("Under Rule 56(e), an affidavit at the summary judgment stage must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  This requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise.") (citations and internal quotation marks omitted).

Prior to deploying his Taser, Buchanan commanded Riley two or three times to get down on the ground.  Buchanan Decl. ¶ 8.  Riley did not comply.  *Id*.  Buchanan continued to point his rifle at Riley while commanding him to get down on the ground.  *Id*. ¶ 9.  Buchanan observed that Riley's body was postured in a way that led Buchanan to believe that Riley was looking for an opportunity and a direction in which to run.  *Id*.  Buchanan's primary objective at that time was to stop Riley from returning to the Brown residence to warn anyone because such a warning would greatly increase the possibility of a violent confrontation.  *Id*.  Therefore, Buchanan transitioned from his rifle to his less-than-lethal Taser, and gave another command for Riley to go to the ground.  *Id*.  When Riley did not comply, Buchanan Tasered him once so that he would go to the ground.  *Id*.

Based on information provided to Buchanan both during training and in the operation plan, as well as radio communications that morning indicating that there were people with guns at the Brown residence, Buchanan decided not to attempt to physically wrestle Riley to the ground.  *Id*. ¶ 10.  Although he did not observe a weapon on Riley, he believed that it was possible that Riley was armed and a potential danger to himself and other law enforcement officers, and that it was also possible that Riley might resist arrest, escape, or otherwise warn the occupants of the Brown residence of the marshals' presence.  *Id*.  He concluded that the safer course of action was to Taser Riley so that he could be immediately detained.  *Id*.

After Riley fell, three or four marshals piled on top of him, trapping one of his arms under him.  Riley Decl. ¶ 7.  After Riley was on the ground, Buchanan and other members of the blocking team lifted him by the arms and legs and moved him to the edge of the driveway.  Buchanan Decl. ¶ 11.  Buchanan then stood up and maintained control of the Taser.  *Id*.  Neither Allen, Buchanan, nor Mertes was involved in handcuffing Riley after he was Tasered.  *Id*.;

Mertes Decl. ¶ 10; Allen Decl. ¶ 10.   Buchanan was present while Riley was handcuffed.

Buchanan Decl. ¶ 11.   Riley protested and resisted being handcuffed, and the officers had to

force his hands behind his back to apply the handcuffs.   *Id*.   Riley was told by someone to give

him his other hand and replied that he couldn't because the hand was trapped.   Riley Decl. ¶ 7.

Someone's knee then came down on the back of his head, driving his left temple into the gravel

as someone else ripped his arm out from underneath him.   *Id*.   At no point during the handcuffing

did Buchanan observe the use of any force that he considered unwarranted or excessive.

Buchanan Decl. ¶ 11.   The handcuffing process was completed in a few seconds, and Riley was

removed to the woods until he could be taken off site.   *Id*.   Allen, Buchanan, and Mertes admit

that they participated in removing Riley into the woods.   Answer to Plaintiff's Complaint (ECF

No. 26) ¶ 16.[6]

As Riley lay in the woods on his stomach, with his hands handcuffed behind his back,

someone pressed a handgun to the back of his head and uttered the threat, "Be quiet or else."

Riley Decl. ¶ 8.   Buchanan could not have been too far away from Riley because Riley was tied

to Buchanan with his Taser wire, which was connected to a dart that was still in Riley's chest.

*Id*.[7]   As Riley lay there, he noticed a camouflage patch sewn on one of the marshals' clothing

that read, "Special Operations Group United States Marshals."   *Id*.   Only then did he become

aware of the identity of his assailants.   *Id*.[8]   After about five minutes of lying on the ground with

---

[6] Buchanan states that other deputy marshals removed Riley to the woods.   *See* Buchanan Decl. ¶ 11.   However, for purposes of this motion, I credit Riley's version of events.

[7] Riley's further statement that the person holding the gun to his head "could have easily been Mertes or Buchanan; and if not, they witnessed this comrade of theirs pressing this handgun against my head[,]" Riley Decl. ¶ 8, is based on speculation and, hence, insufficient to defeat summary judgment.   Even crediting Riley's statement that Buchanan "could not have been too far away," *id*., and taking into account the admission in the defendants' answer to the complaint that Mertes and Buchanan assisted in removing Riley to the woods, one cannot draw a reasonable inference that either man pointed the gun at Riley's head or even witnessed this incident.

[8] As noted above, however, there is no genuine dispute that Riley screamed to warn Edward Brown that "they" were here, indicating that, shortly after encountering Mertes and Allen, he perceived that they were law enforcement (*continued on next page*)

the handgun pressed to his head, Riley was forced to walk back up the driveway, surrounded by members of the Special Operations Group.  *Id.* ¶ 10.  On this walk, the team members appeared aggravated and frustrated that their planned ambuscade had failed.  *Id.*

Riley was thrown into an SUV, where team members exhorted him to tell anyone who asked that rubber bullets had been shot at him.  *Id.* ¶ 11.  He was taken to the Lebanon, New Hampshire, Police Department and interrogated.  *Id.* ¶¶ 11-12.  During the interrogation, he was told by his interrogators about 20 times that rubber bullets had been shot at him.  *Id.* ¶ 12.  At the Lebanon Police Department, Riley met one of the shooters (Mertes or Allen) and asked him: "Why did you shoot at me?"  *Id.*  Riley added, "That bullet just missed my head.  You could have killed me."  *Id.*  With a grin on his face and a chuckle, the shooter replied, "I missed you on purpose."  *Id.*  During the interrogation, Riley was never told that he had broken any laws.  *Id.* He was told that he was being detained because he had discovered the Special Operations Group team.  *Id.*

Edward Brown was made aware of the marshals' presence on his property by the sound of their gunshots and the dog returning to his house.  *Id.* ¶ 9; "Ed Brown Under Siege" broadcast of June 8, 2007, Attach. DD thereto, included on CD filed with Clerk's Office.

Riley suffered a Taser puncture wound in his left shoulder and a head/eye wound.  Riley Decl. ¶ 8; Photographs of Riley, Attach. CC thereto, included on CD filed with Clerk's Office.

### III. Discussion

In the wake of this court's earlier partial grant of the defendants' motion to dismiss, two claims remain: (i) a cause of action for civil conspiracy with respect to the alleged use of excessive force against Riley and (ii) a cause of action for the use of excessive force against

_____

officers of some kind.

Riley, in violation of the Fourth Amendment.  *See* Dismiss Order at 11; Complaint ¶¶ 32-36.

The defendants seek summary judgment as to all remaining claims on the grounds that (i) Allen, Mertes, and Buchanan are entitled to qualified immunity because the force used against Riley was reasonable in the circumstances, (ii) Monier is entitled to qualified immunity because there is no basis for imposing supervisory liability against him, and (iii) the claims against the John Doe defendants are time-barred.  *See* Defendants' Memo at 8-15.  Riley does not contest that his claims against the John Doe defendants are time-barred, but does oppose the entry of summary judgment in favor of Allen, Mertes, Buchanan, and Monier.  *See* Plaintiff's Memo at 8-17.  For the reasons that follow, I conclude that Allen, Mertes, Buchanan, and Monier are entitled to qualified immunity, and that Riley's claims against the John Doe defendants are indeed time-barred.  Hence, I recommend that the court grant the defendants' motion.

### A.  Qualified Immunity

Qualified immunity shields public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The doctrine aims "to avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment."  *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010).

As the First Circuit has noted:

[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation. . . .  [T]he second step, in turn, has two aspects.  One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation.  To overcome qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.  Indeed, it

14

is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citations and internal punctuation omitted).  "On summary judgment on qualified immunity, the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation."  *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006).

"[W]hile it is frequently appropriate for courts to answer each step in turn, it is not mandatory that courts follow the two-step analysis sequentially."  *Maldonado*, 568 F.3d at 269-70.  "Courts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right."  *Id*. at 270.

The defendants contend that the cognizable facts, even viewed in the light most favorable to Riley as nonmovant, do not make out a violation of Riley's Fourth Amendment right to be free from the use of excessive force.  *See* Defendants' Memo at 2.

"Where . . . [an] excessive force claim arises in the context of an arrest . . . it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons . . . against unreasonable … seizures of the person."  *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148 (1st Cir. 2003) (citation and internal quotation marks omitted).

The Fourth Amendment permits police officers to use "objectively reasonable" force to effectuate an arrest.  *Graham v. Connor,* 490 U.S. 386, 396-97 (1989).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Peña-Borrero v. Estremeda*, 365 F.3d 7, 12 (1st Cir. 2004) (citations and internal quotation marks omitted).

The Supreme Court [in *Graham*] has furnished a non-exclusive list of criteria for determining the objective reasonableness of a police officer's use of force.  These criteria include the severity of the crime at issue, the extent (if any) to which the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009) (citation and internal quotation marks omitted).

Riley identifies four instances in which excessive force allegedly was used against him on the morning of June 7, 2007: (i) the firing of lethal weapons at him by Mertes and Allen as he fled from the arrest team stationed near the Browns' mailbox, (ii) the firing of a Taser dart into his shoulder by Buchanan, (iii) the smashing of his head into the ground during the handcuffing, and (iv) the holding of a handgun to his head after he had been subdued and handcuffed.  *See* Plaintiff's Memo at 9-16.

He argues that he generates triable issues of fact as to Allen's and Mertes' liability for the use of lethal force and for failing to intervene to prevent a handgun from being held to his head, Buchanan's liability for the use of the Taser and for failing to intervene to prevent his head from being smashed during handcuffing or a handgun from being held to his head, and Monier's liability for acquiescing, as supervisor, in both the shooting and the Tasering and for failing to intervene to prevent the further use of excessive force after witnessing the attempted shooting of Riley.  *See id.*  Riley also finally contends that a reasonable jury could conclude that, as a result of the use of excessive force, the failures to intervene to prevent such force, and the alleged cover-up by the USMS of the use of deadly force, the defendants were engaged in a conspiracy to violate his Fourth Amendment rights.  *See id.* at 16.

**1.  Firing of Allegedly Lethal Shots at Riley: Mertes, Allen**

As Riley points out, *see id.* at 9, "a police officer may not use deadly force against a fleeing suspect unless it is necessary to prevent the suspect's escape *and* the suspect poses a significant threat of death or serious physical injury to the officer or others[,]" *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 7 (1st Cir. 2005) (emphasis in original).  *See also Jarrett*, 331 F.3d at 149 ("The deadly/non-deadly distinction is significant in the Fourth Amendment context [because] the use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians.").

Riley argues that the alleged use of lethal force against him was objectively unreasonable in that (i) he was suspected of no crime, (ii) while it is true that he was fleeing, he did so only because Allen and Mertes deliberately pointed an assault rifle at him and failed to identify themselves, as a result of which he feared for his life, and (iii) he posed no threat in that he was more than a half mile from the Browns' house, was unarmed, had made no threats or gestures, and was about to run into at least 12 heavily armed marshals who formed the "blocking team." *See* Plaintiff's Memo at 10.

He adds that, to the extent that the defendants profess to have been concerned that he might warn the Browns of their presence, their gunshots and the dog's return to the Browns' house in an excited state had already put the Browns on such notice.  *See id.*  He contends that (i) a reasonable officer would have known that the firing of weapons more than likely would alert Edward Brown to officers' presence, (ii) mere subjective fear of danger is not enough to justify officers' use of force, and (iii) the simple solution to address any perceived danger was to withdraw the teams and retreat.  *See id.* at 10-11.   He argues that Mertes' and Allen's failure to issue a warning before firing shots also tends to undermine the reasonableness of their conduct. *See id.* at 11.

Nonetheless, in all of the circumstances, Mertes' and Allen's firing of non-lethal weapons was reasonable.  Mertes and Allen knew from their training and from the finalized Operations Order that the Browns were considered armed and dangerous, that they had threatened to harm any law enforcement officer who attempted to take them into custody, and that they had a great many sympathizers, some of whom might be present on the property and also might be armed. Any suspicion that Riley was a sympathizer and an accessory-after-the-fact of the Browns, rather than simply an innocent bystander out for a morning stroll with a dog and a cup of coffee, was confirmed when, upon being ordered at gunpoint to freeze, Riley turned and ran back toward the Browns' house, screaming, "Ed, they're here.  Ed, they're here."  In so doing, Riley not only jeopardized the marshals' carefully planned mission but also potentially jeopardized their lives. In the split seconds that they had to consider their options, Mertes and Allen reasonably concluded that Riley had to be stopped.[9]  They then reasonably deployed non-lethal weapons to do so.  In the circumstances, they also reasonably dispensed with the giving of any warning before firing.  Time was of the essence, and Riley had already demonstrated a willingness to take personal risks to warn the Browns.[10]

---

[9]  Riley cites *St. Hilaire v. City of Laconia*, 71 F.3d 20 (1st Cir. 1995), for the proposition that it is unreasonable as a matter of law, in the Fourth Amendment context, for law enforcement officers to fail to identify themselves. *See* Plaintiff's Memo at 11.  The First Circuit, in *St. Hilaire*, did not set forth such a fixed rule, but instead observed that the giving of notice is part of the reasonableness inquiry.  *See St. Hilaire*, 71 F.3d at 28.  On the totality of the circumstances of that case, law enforcement officers' failure to identify themselves led to the use of excessive force. *See id.* 26-27.  In this case, Riley's conduct that led to the use of force was predicated on his correct supposition that he had happened upon law enforcement officers, rather than any misapprehension as to Allen's and Mertes' identity caused by their failure to identify themselves.

[10]  Riley's arguments that a reasonable officer would have known that the shooting, in itself, likely would alert the Browns, and that there were better options than the shooting, including letting the "blocking team" stop him and/or abandoning the mission and retreating, are unpersuasive.  As the defendants argue, there were no perfect options: "Allen and Mertes could have let Riley run and hope that either he did not reach Mr. Brown or that they could safely retreat before Mr. Brown could react.  Or they could have tried to stop Riley and hope that Mr. Brown either did not realize, or was at least slow to realize, what was unfolding.  Both courses involved risk and Allen and Mertes had to decide how to react instantaneously."  Defendants' Reply at 5-6.  Allen and Mertes, "acting in the heat of events, made a defensible (albeit imperfect) judgment[,]" a circumstance in which the doctrine of qualified immunity aims "to avoid the chilling effect of second-guessing[.]"  *Statchen*, 623 F.3d at 18; *see also, e.g., Mlodzinski*, 648 F.3d at (*continued on next page*)

Even viewing the cognizable facts in the light most favorable to Riley, Mertes and Allen did not violate his Fourth Amendment rights in firing non-lethal shots at him as he fled and yelled warnings to Edward Brown.[11]

### 2.  Firing of Taser: Buchanan

With respect to the Tasering, Riley contends that all three *Graham* factors weigh in his favor in that (i) he was suspected of committing no crime, (ii) he did not pose an immediate threat, and (iii) he was not fleeing or resisting arrest but, rather, offering himself up to be handcuffed when he was Tasered without warning.  *See* Plaintiff's Memo at 11-12.  He adds that a Taser deployed in dart mode has been recognized as a more powerful, albeit non-deadly, use of force than a Taser used in stun mode.  *See id*. at 13; *see also, e.g., Brooks v. City of Seattle*, 599 F.3d 1018, 1026 (9th Cir. 2010), *aff'd in part, rev'd in part on other grounds en banc sub nom. Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (noting that, whereas a Taser's use in "touch" or "drive-stun" mode involves touching the Taser to the body and causes temporary, localized pain only, a Taser's use in dart mode, wherein darts are shot at a suspect from some distance, can cause neuromuscular incapacitation, with the Seattle Police Department classifying the Taser in stun mode as a "Level 1 tactic," akin to hair control holds or use of pepper spray, and the Taser in dart mode as a "Level 2 tactic," to be employed only against aggressive resistance).

Turning to the first *Graham* factor, the marshals had reason to believe, given Riley's

---

34 ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (citation and internal quotation marks omitted).

[11] Alternatively, the defendants argue, *see* Defendants' Memo at 11-12, that even if Riley raised a genuine issue that Mertes and Allen deployed lethal force against him, he still would fall short of showing, as is required to defeat qualified immunity, that there was "an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim[,]" *Mlodzinski,* 648 F.3d at 33 (citations and internal quotation marks omitted), given Riley's attempt to warn the Browns, the close proximity of the marshals' sniper unit to the Browns' house, the reported presence of weapons in the house, and the Browns' reported threat to harm law enforcement officers attempting to take them into custody.  I need not reach that question because Riley falls short of generating a genuine issue as to whether Mertes and Allen used lethal force against him.

attempts to warn Edward Brown of their presence, that he was guilty of the crime of being an accessory-after-the-fact.   With respect to the second and third *Graham* factors, Buchanan reasonably, even if mistakenly, perceived Riley as a threat to the marshals' safety and as resisting arrest.   The *Graham* factors, hence, weigh in favor of the reasonableness of the deployment of a less-than-lethal force such as the Taser.

Riley argues that, at the time of the Tasering, he did not pose a threat in that (i) he was unarmed, (ii) he had made no verbal threats or gestures, (iii) his hands were visible, (iv) he was surrounded by 12 officers pointing rifles at him, and (v) the gunshots already had alerted the Browns to the marshals' presence.  *See* Plaintiff's Memo at 12.

Nonetheless, Buchanan knew that (i) Edward Brown was a member of a militia group, frequently carried weapons in public, and was believed to be storing weapons on his Plainfield property, (ii) radio communications that morning indicated that there were people with guns at the Brown residence, (iii) the Browns had many sympathizers and had sought help from those individuals by, among other things, asking for weapons, (iv) the Browns had threatened violence against law enforcement officers who tried to take them into custody, and (v) Elaine Brown had indicated that the Browns were willing to die rather than be taken into custody.  Buchanan also knew that Riley had fled following an encounter with the arrest team stationed near the Browns' mailbox.  Buchanan did not see a weapon on Riley but was not certain that he was unarmed. Finally, Riley did not comply with Buchanan's repeated commands, at gunpoint, that he get to the ground.

I have credited, for purposes of summary judgment, Riley's assertion that he was being subjected to conflicting commands from the 12 marshals surrounding him, he was confused, and he held out his arms in an attempt to submit to handcuffing.  Nonetheless, he does not controvert

that he stopped running only after being commanded several times by Buchanan to do so, that he never complied with Buchanan's repeated commands that he get to the ground, and that, at least at some point prior to the Tasering, Buchanan observed that his body was postured in a way that led Buchanan to believe that he was looking for an opportunity and a direction in which to run. *Id*.[12]

In the potentially dangerous circumstances of the attempt to execute the warrants against the Browns, Buchanan reasonably could have concluded that he needed to employ force to get Riley to the ground immediately. *See Asociación de Periodistas de P.R. v. Mueller*, 680 F.3d 70, 82-84 (1st Cir. 2012) (although a jury could find that agents were mistaken in concluding that journalist attempted to strike them and was resisting arrest, agents' actions in pepper-spraying journalist twice were not unreasonable mistakes in "combustible situation" in which a large group of people, including journalists, intruded into complex where agents were attempting to execute a warrant related to anti-terrorism investigation, and some members of the crowd were angry or hostile); *Statchen*, 623 F.3d at 18 ("While qualified immunity is often invoked in cases where legal principles were unclear at the time of the disputed conduct, it also protects reasonable assessments of fact, even if matters might have been handled differently in the calm of retrospective appraisal.") (citations omitted).

Riley suggests that, whatever Buchanan's concerns, he could and should have chosen a less painful and intrusive alternative, for example, simply handcuffing Riley's outstretched hands or physically taking him to the ground. *See* Plaintiff's Memo at 12. He cites *Parker v. Gerrish*,

---

[12] Riley argues that the court must ignore Buchanan's subjective belief that Riley appeared to be looking to run, which does not square with the facts, given that Riley was completely surrounded by marshals and had nowhere to run. *See* Plaintiff's Memo at 12-13. Nonetheless, the fact that Riley was surrounded is not, in itself, necessarily inconsistent with Buchanan's statement. Riley's body posture, combined with the fact that he did not stop when ordered by Mertes and Allen at gunpoint to do so or when initially ordered at gunpoint by Buchanan to do so, could have reasonably led Buchanan to believe that he was looking to continue to run.

547 F.3d 1 (1st Cir. 2008), for the proposition that the First Circuit has rejected a justification for

Taser use similar to that offered by Buchanan, namely, to prevent or avoid a physical struggle.

*See id.*

However, as a general proposition, a use of force is "not unreasonable simply because

[the] officer failed to perfectly calibrate the amount of force required to protect himself."

*Mueller*, 680 F.3d at 81 (citation and internal punctuation omitted).   Further, as the defendants

argue, *see* Defendants' Reply at 7-8, *Parker* is distinguishable.   In that case, the First Circuit

found that a jury could have concluded that officers would *not* have been obliged to physically

wrestle the suspect to the ground in the absence of use of the Taser.   *See Parker*, 547 F.3d at 10-

11 ("We do not hold that the officers would have been required to physically wrestle Parker to

the ground without recourse to the Taser.   Rather, we find that the jury could have concluded that

such a struggle would not have been necessary – that in the absence of the Taser, Parker would

have submitted to cuffing without presenting a risk to the officers.").   In this case, Riley did not

comply with Buchanan's repeated commands that he get to the ground.   Buchanan reasonably

judged the use of force necessary to compel him to do so.

### 3.   Supervisory Liability/Failure To Intervene: Monier

"[A] supervisory official may be held liable for the behavior of his subordinates only if

(1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's

action or inaction was affirmatively linked to that behavior in the sense that it could be

characterized as supervisory encouragement, condonation or acquiescence or gross negligence

amounting to deliberate indifference."   *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)

(citations and internal punctuation omitted).

In addition, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault v. Municipality of Salem, Mass*., 923 F.2d 203, 207 n.3 (1st Cir. 1990).  However, "[a] police officer cannot be held liable for failing to intercede if he has no realistic opportunity to prevent an attack."  *Id*. (citation and internal quotation marks omitted).

Riley faults Monier for (i) failing to remind his subordinates, when Monier first saw the unarmed Riley come into view over his video feed, not to use deadly force unless faced with the imminent threat of death or serious injury, and (ii) failing to intervene when his subordinates did use lethal force against Riley.  *See* Plaintiff's Memo at 14.  Riley reasons that Monier's intervention, at that point, could have forestalled the further use of excessive force, including his Tasering by Buchanan. *See id*. at 14-15.

Monier had no duty to warn his subordinates, or otherwise intervene, as soon as Riley appeared in view on his video feed.  He had no information that the marshals were likely to use excessive force, and the arrest plan called for the use of non-lethal force to the extent possible. While Riley states that he was unarmed, that fact could not be verified by Monier, watching a video feed from a remote command post.  Nor did Monier have a duty to intervene upon witnessing Mertes' and Allen's firing of shots at Riley, a use of force that I have concluded was objectively reasonable in the circumstances.  Riley fails to controvert Monier's evidence that, once Riley fled toward the Browns' house, Monier lost sight of him through the video feed and did not witness the Tasering or handcuffing that followed.

Beyond this, Monier avers that he had no authority to give orders or directions from the command post to law enforcement personnel engaged at the Brown property because that

authority belonged to the Tactical Operations Commander on site. As the defendants observe, even if Monier had the authority to intervene from his remote location, events were unfolding so quickly that it is doubtful, as a practical matter, that he would have had any realistic opportunity to dictate what was happening on the ground.

For all of these reasons, Monier is entitled to qualified immunity as to Riley's claims of supervisory liability and failure to intervene.

### 4.   Failure To Intervene: Buchanan, Mertes, and Allen

Riley next faults (i) Buchanan for failing to intervene when a comrade lifted his knee and smashed Riley's head during the handcuffing process, (ii) Buchanan or Mertes for pressing a handgun against Riley's head when he was already subdued, and/or (iii) Buchanan, Mertes, and Allen for failing to intervene when someone pressed a handgun against Riley's head. *See id*. at 15-16.

As the defendants rejoin, *see* Defendants' Reply at 8-9, Riley's conjecture that Buchanan or Mertes might have held a gun to his head does not suffice to generate a triable issue as to whether they did so, *see, e.g., Fragoso v. Lopez*, 991 F.2d 878, 887 (1st Cir. 1993) ("proffers that depend not on verified facts but on arrant speculation, optimistic surmise, or farfetched inference cannot forestall summary judgment") (citation and internal quotation marks omitted); *Norton v. Cross Border Initiative Task Force*, No. 06-cv-490-PB, 2009 WL 1651238, at *7 (D.N.H. June 12, 2009) (noting, in excessive force case, that "because Norton's statement that Rivet 'must have been' the puncher is an assumption and does not demonstrate the requisite personal knowledge, it cannot create a genuine issue of material fact precluding summary judgment").[13]

---

[13] The defendants also argued that Riley's speculation could not overcome the clear testimony of both Buchanan and Mertes that they did not hold a gun to his head, citing excerpts from Buchanan's and Mertes' answers to interrogatories that purportedly were attached to the Defendants' Reply. *See* Defendants' Reply at 8-9. Upon (*continued on next page*)

To the extent that Riley faults Buchanan, Mertes, and Allen for failing to intervene with respect to this incident, he relies on evidence that they were in that area at the time.  As the defendants argue, *see* Defendants' Reply at 10, this does not suffice to create a triable issue as to whether they even witnessed the handgun incident, let alone had a "realistic opportunity" to curtail it.    *Gaudreault*, 923 F.2d at 207 n.3 (citation and internal quotation marks omitted).  In any event, as the defendants alternatively argue, *see* Defendants' Reply at 10-11, even on Riley's version of events, the gun was held to his head to keep him quiet.  In the circumstances, in which the shouting of a warning reasonably was believed not only to jeopardize the mission but also potentially marshals' lives, the deployment of such force for a period of approximately five minutes cannot be said to have been unreasonable.  *Compare, e.g., Mlodzinksi*, 648 F.3d at 39 (aiming a loaded firearm directly at a person "may be excessive and unreasonable" in circumstances in which "a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others") (citation and internal quotation marks omitted).

To the extent that Riley faults Buchanan for failing to intervene with respect to the handcuffing, Riley fails to explain how Buchanan had any realistic opportunity to intervene given that the entire handcuffing process lasted only seconds.  *See, e.g., Gaudreault*, 923 F.2d at 207 n.3 (in circumstances in which "the attack came quickly and was over in a matter of seconds[,]" officer had "no realistic opportunity to prevent" it) (citation and internal quotation marks omitted).  In any event, in circumstances in which Riley was unable to extend his arm,

---

discovering that those documents were not attached to the Defendants' Reply, I requested that defendants' counsel provide them.  The defendants' counsel filed an addendum, docketed at ECF No. 52, but it did not contain the documents at issue (the interrogatory answers).  Hence, I have not taken those documents into consideration.  Nothing turns on the omission, however.  Riley still fails to adduce sufficient evidence to generate a triable issue as to whether Buchanan or Mertes held a gun to his head.

even for reasons beyond his control, one brief shove to the back of his head while his arm was freed cannot fairly be said to constitute excessive force.  *See, e.g., Peña-Borrero*, 365 F.3d at 12 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (citations and internal quotation marks omitted).

### 5.   Claimed Conspiracy

Riley seeks to stave off summary judgment with respect to his conspiracy claim on the basis that a reasonable jury could conclude that an agreement existed, joined by each defendant, to violate his Fourth Amendment rights.  *See* Plaintiff's Memo at 16.  He argues that the overt acts in furtherance of that agreement include the use of deadly force, the use of non-deadly force, the failure to intervene in the use of such force, and the defendants' subsequent cover-up of the use of deadly force.  *See id*.

With respect to the use of force, as discussed above, Riley falls short of making out a triable issue that any of the defendants used excessive force or failed to prevent its use against him.  With respect to the alleged cover-up, he relies on what amounts to surmise, pointing to (i) Monier's statements to the media that no deadly force was used to detain him, (ii) Allen and Mertes' apparent falsification of police reports to cover up their use of deadly force, (iii) the recovery by an unknown marshal of shell casings from the rifle used to shoot at him, and (iv) the apparent alteration by the defendants or their agents of the videotape that captured the use of deadly force against him.  *See id*.

Given Riley's failure to present competent evidence that deadly force was used, one cannot draw a reasonable inference from (i) the relatively poor resolution quality of the portion of the videotape capturing the shooting incident, (ii) Monier's denial of the use of deadly force,

or (iii) Mertes' and Allen's reports of the use of non-deadly force, that the marshals were engaged in a cover-up of the use of deadly force.[14]   The defendants, hence, are entitled to summary judgment with respect to Riley's conspiracy claim.  *See, e.g., Fragoso*, 991 F.2d at 887 ("proffers that depend not on verified facts but on arrant speculation, optimistic surmise, or farfetched inference cannot forestall summary judgment") (citation and internal quotation marks omitted).

### B.  Claims Against John Doe Defendants

"[I]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued."  *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (citation and internal quotation marks omitted).  Thus, a plaintiff cannot take advantage of the relation-back doctrine under Federal Rule of Civil Procedure 15(c) when he names an unidentified defendant because the naming of the "John Doe" defendant was not the result of a mistake concerning the identity of the proper defendant.  *See, e.g., Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995), *as amended*, 74 F.3d 1366 (2d Cir. 1996); *Wilson v. United States Gov't*, 23 F.3d 559, 563 (1st Cir. 1994)

"While Congress has not established a limitations period for *Bivens* claims, courts generally have applied state statutes of limitations to *Bivens* actions notwithstanding the fact that

---

[14]   In discussing the alleged falsification of the Use of Force reports, Riley avers, *inter alia*, that the reason given by Allen and Mertes for shooting at him was because he sicced the dog on them, which he did not do.  *See* Riley Decl. ¶ 18.  While Allen does state in his Use of Force Report that Riley ordered his dog to "go get him," he attributes his use of force not to the alleged dog command but rather to Riley's flight toward the Browns' house, during which he yelled as he ran, causing Allen to fear that he would alert the Browns and compromise the sniper unit surrounding the residence.  *See* Allen Use of Force Report, contained in Attach. FF to Riley Decl., included on CD filed with Clerk's Office.  Mertes, who makes no mention of any dog command by Riley, also states that he fired a less-than-lethal round at Riley because Riley had turned and begun running toward the house, yelling as he went, causing Mertes to fear that he was going to compromise the mission and place the marshals in danger.  *See* Mertes Use of Force Report, contained in Attach. FF to Riley Decl., included on CD filed with Clerk's Office.

such actions lie only against federal officers." *Estate of Barrett v. United States*, 462 F.3d 28, 38 (1st Cir. 2006) (citation and internal quotation marks omitted).  The appropriate state analogue for an excessive force claim is the statute of limitations for personal injury.  *See, e.g., Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003).   New Hampshire has a three-year statute of limitations for personal injury claims.  *See* N.H. Rev. Stat. Ann. § 508:4.

The events underlying Riley's excessive force claims took place on June 7, 2007.  He, therefore, had until June 8, 2010, to identify the "John Doe" defendants.  He has not done so. Hence, as the defendants argue, *see* Defendants' Memo at 14-15, his claims against those defendants are time-barred.

### IV. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the defendants' motion for summary judgment as to all claims against them.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 24th day of August, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge